Filed 8/7/15  In re H.W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.W., a Person Coming Under the Juvenile Court Law. | B261152 (Los Angeles County Super. Ct. No. CK94581) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JASMINE C.,<br><br>Defendant and Respondent. | **ORDER MODIFYING OPINION**<br><br>**[No Change in Judgment]** |

THE COURT:

The opinion filed herein on August 4, 2015 is ordered modified as follows:

Page 2:  Delete the last sentence of the first paragraph and replace it with the following sentence:  We reverse and remand for further proceedings.

This modification does not effect a change in judgment.

Filed 8/4/15  In re H.W. CA2/2 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.W., a Person Coming Under the Juvenile Court Law. | B261152 (Los Angeles County Super. Ct. No. CK94581) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. JASMINE C., Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County. Connie Quinones, Judge.  Reversed and remanded with directions.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Appellant.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Respondent.

_____

The touchstone of dependency proceedings is the best interest of the child. Here, the juvenile court ignored the child's interests and granted parent reunification services on the day of the permanent plan hearing. (Welf. & Inst. Code, §§ 388, 366.26.)[1] The record discloses no evidence of changed circumstances. The court showed undue solicitude for violent, unfit parents who never advanced beyond monitored visits, while displaying indifference to state law and policies designed to provide permanency to a four-year-old child who has been a dependent since the age of one. We reverse and remand for further proceedings before a different judge.

## FACTS

H.W. was born in December 2010, to Jasmine C. (Mother) and David W. (Father). In July 2012, when H. was one year old, the police were called to a gas station where Mother and H. were hiding: Father had attacked Mother after she refused his demand for money. He slapped her face, threw her on the ground, throttled her neck, impaired her breathing, then burned her neck with a cigarette, causing pain. After the attack, Mother grabbed H. and ran, while Father chased them and pushed Mother from behind. Mother admitted that Father has hit her in the past; their relationship has been abusive for four years. Father fled before the police arrived to arrest him for spousal assault and child endangerment.

Despite Father's propensity for domestic violence, H. regularly stays overnight with him because Mother feels that the child "is in need of her father." Mother did not want to press charges against Father. She rationalized that "Father had acted out of desperation with no intention to hurt her." However, she admitted that "each time that she brought the child to see him, he beat her up and traumatize[d] her kid." Mother did not seek a restraining order against Father because she feared retaliation.

The maternal grandmother (MGM) indicated that Mother has twice called her for help after being beaten up by Father, and stated that "mother and father have known that

---

[1] Unlabeled section references in this opinion are to the Welfare and Institutions Code.

their altercations have negative effects on the child but they have deliberately ignored it." Father lives with the paternal grandmother (PGM), who denied hearing any altercation and suggested that Mother "has made up [the] story to get even with her son" for ending their relationship. The PGM noted that Father has a prior conviction for domestic violence; a new conviction will be his "third strike." She denied that Father abuses women and described him as a loving and caring parent to H. Her statements were echoed by her husband, a stepfather to Father, who also denied hearing any altercation and accused Mother of retaliation and fabrication. The PGM and stepfather denied knowing the whereabouts of Father, who was sought by police.

A social worker deemed H. to be at "very high" risk for neglect and abuse. Father inflicted severe bodily harm on Mother, punching her on repeated occasions in the child's presence. He has disappeared and does not provide for his daughter's basic needs. H. was left in Mother's care.

A petition was filed alleging that the parents have a four-year history of violent altercations, and Father assaulted Mother while H. was present. Mother allows Father unlimited access to the child. On July 20, 2012, the court found a prima facie case for detaining H. from both parents, and ordered the Department of Children and Family Services (DCFS) to provide reunification services. The parents were allowed monitored visits.

For the jurisdiction hearing, DCFS reported that H. was placed with a paternal aunt. Father, born in 1983, has a criminal record beginning in 1997: it includes multiple arrests for assault; battery on a school employee; making terrorist threats; robbery; a burglary conviction; a conviction for assault with a deadly weapon on a spouse or cohabitant; a conviction for threatening a crime with the intent to terrorize; a conviction for assault with a deadly weapon; multiple drug arrests; and parole violations.

During an interview, the DCFS investigator noticed a circular burn mark on Mother's neck. Mother proceeded to deny that Father hurt her, describing herself as the aggressor. Mother claimed that Father "never put his hands on her, and if anything, she would hurt him." She added that "Her baby needs her daddy." Mother stated that "she

3

hit herself with a door," which is why her face was red when the police arrived, not because Father slapped her. She denied that Father threw her to the ground or choked her. The burn mark on her neck occurred when she tried to remove a cigarette from Father. Mother acknowledged that she twice gave the police the same account of her injuries, which is an entirely different story from the one she is telling now. Mother "indicates that there has been no previous domestic violence in the relationship." She is aware of Father's conviction for domestic violence, including an incident in which he broke a girl's jaw and ribs. Mother was 22 years old, and met Father when she was 18.

Father claimed that his arguments with Mother are verbal, not physical, and that Mother is the aggressor in their relationship. During the July altercation, Mother "ran up on him and ended up burning herself on the neck with the cigarette." He denied slapping or choking Mother, or seeing any injuries on her. Father acknowledged that he went to prison for making terrorist threats, characterizing it as "a whole bunch of nothing." He has not had any domestic violence counseling, and denies a history of drug or alcohol abuse. Father was vague when asked to explain a prominent tattoo just below his neck showing a woman shooting herself in the head with the words, "Broke, Bitch, Killer."

Father's "Statement Regarding Parentage" agrees that H. is his child; he provides for her needs and takes primary care of her. He has never lived with Mother or the child, and was not present at birth. Mother identified him as H.'s father.

The MGM was re-interviewed and said "she had no knowledge of the mother ever being in a relationship that involved domestic violence," and only recently heard that Mother and Father "got into it" because Mother was upset and mad. A police report of the July 2012 altercation indicates that Father demanded $50 from Mother; when she refused, he became enraged, slapped her, threw her down, straddled her, and pressed with both hands on her neck, saying "don't talk back to me, you're going to give me what I want." He grabbed a cigarette from an ashtray and burned her neck. Mother stated that Father previously hit her and beat her with a belt, but she never reported it before now. The police photographed her injuries.

4

On August 8, 2012, DCFS informed Mother that she has a limited time to reunify with her child and complete court-ordered programs. DCFS explained that if Mother fails to reunify, a permanent plan will be set that could result in loss of parental rights. Mother stated that she understood. Father stated that he understood, as well.

A supplemental report shows that in 2007, Father violently assaulted a woman, hitting her in the face, stomping on her neck, throwing a television at the victim, then dropping the television on the victim's head six times while she tried to protect herself. When the victim went to clean the blood off, Father said, "I could have killed you." The police found the victim with obvious injuries on the face and neck, and a blood-stained television in her bedroom. Father pleaded guilty to charges of assault with force likely to produce great bodily injury.

Mother was homeless in September 2012. She attended parenting classes once a week, and rarely visited H. She had difficulty traveling for monitored visits, but when the venue was changed to accommodate her, she failed to show up. H. was living comfortably with her paternal aunt, who is a probation department officer, and her seven-year-old cousin.

On September 21, 2012, the court sustained the petition under section 300, finding that Mother and Father have a four-year history of violent altercations in which Father physically assaulted Mother; caused bleeding contusions on Mother's neck with a lit cigarette in the child's presence; slapped Mother's face and mouth; pushed Mother against a wall; threw her to the ground; choked Mother and impaired her breathing. He has struck Mother on prior occasions. Mother kicked Father. Mother failed to protect H. by repeatedly taking the child to Father's home and allowing him unlimited access to the child. Father's violent conduct and Mother's failure to protect the child place H. at risk of harm.

The parents were warned at the hearing that before there can be reunification, they must demonstrate the ability to meet the child's physical and emotional needs, and provide stable and appropriate housing. The court informed them that failure to participate regularly and make progress in court-ordered treatment programs may result

in termination of reunification services and termination of parental rights if custody is not achieved by March 22, 2013. Mother was ordered to participate in a domestic violence program and individual counseling. DCFS had no discretion to allow unmonitored visits.

After the adjudication, family members continued to express disbelief that Father attacked Mother. H.'s aunt could not believe that Father would jeopardize his parole "for a measly fifty dollars." She knows that he served time for domestic violence, and agreed that if DCFS and the police believed Mother's account, she would not risk her job by saying otherwise and understood that she must protect her niece. After reading the police report, the PGM continued to deny that Father harmed Mother.

Mother completed a 12-week parenting course, but did not have a stable living situation. In November 2012, Mother enrolled in an anger management and counseling program, and was given referrals to domestic violence support groups. In December 2012, Mother called the social worker, crying, saying that Father threatened to kill her and she was afraid. The social worker advised Mother to get a restraining order. One month later, Mother said she "was no longer afraid of [Father] 'because he just gets emotional and crazy like that.'" She did not obtain a restraining order. Father "acknowledged his mistake and is addressing it in counseling."

In February 2013, H. was detained after the paternal aunt requested her removal. Father made accusations that H. was sexually abused in July 2012, because the child said "ouch" during a diaper change, had a vaginal odor, and his seven-year-old nephew incurred a $190 charge while watching pornography at the PGM's home.[2] The caretaker denied Father's claims, but wanted H. removed owing to the false accusations against her son. Father requested unmonitored overnight visits with H.

Following removal from her aunt's home, H. had two foster placements. A forensic examination found "[n]o evidence of physical or sexual abuse or of child neglect." Mother continued to have an unstable living situation. She and Father

---

[2] H. was removed from parental custody on July 20, 2012.

faithfully visited H. H. is excited to see her parents, who are loving and affectionate with her. Mother indicated that she was almost done with counseling and was "working on my domestic violence classes," completing six of 32 sessions. Father believed that all he needed to do to reunify with H. was have unmonitored visits with her. He did not complete anger management or parenting classes, and was not enrolled in an approved domestic violence program.

In March 2013, DCFS recommended that the parents receive six more months of reunification services. The alternative recommendation was a permanent plan of adoption. Though the paternal aunt would have adopted H., the birth parents made false abuse accusations, jeopardizing her job at the probation department and creating stress and fear for her young son. Father came to her home, "yelling and causing a scene."

On March 21, 2013, Mother and Father engaged in domestic violence. While Mother drove Father to a visit with H., they argued and Father punched Mother in the face. Police officers saw swelling to Mother's cheek and arrested Father for battery. A month later, Mother had not yet sought a restraining order. DCFS opined that they have "not yet fully internalized the lessons" from their court-ordered programs.

On May 28, 2013, the court found that reasonable services were provided, but parental progress to alleviate the causes leading to detention was "minimal." There was no substantial likelihood that H. could be returned to parental custody within the next six months. The court terminated reunification services, and directed DCFS to place H. in a prospective adoptive home within one week. The parents were notified that a permanent plan hearing was set for September 23, 2013, at which time DCFS would seek to have the court terminate parental rights and implement a plan of adoption.

By September 2013, H. was living in the home of the L. family, who have two biological children and expressed commitment to adoption. H. had been in a stable placement with the L. family for five months; however, DCFS began assessing the PGM as a potential placement for the child. Mother and Father continued to visit H. During a visit in August, Mother was on her telephone cursing in the child's presence. When

confronted, she denied using profanity.  During visits, Mother engages with H., who smiles, is happy, and shows Mother affection.

On the day of the permanent plan hearing, Mother petitioned for a modification, stating that she "completed Phase I of the . . . Domestic Violence education program" and obtained a protective order against Father, whom she has not seen "since their last domestic violence incident."  She requested six months of reunification services.  The court denied the petition without a hearing:  Mother did not show changed circumstances, and "Mother's progress is very recent," given the latest incident of domestic violence.  The court set a contested permanent plan hearing for November 15, 2013.

On November 15, 2013, DCFS asked to move H. from the prospective adoptive family to the PGM.  DCFS made no mention of the PGM's vehement refusal to accept that her son batters women, an attitude that persisted even after the juvenile court sustained charges against Father.  Father and Mother called the caregivers' home outside of approved hours, demanded to speak to H., and cursed.  Father threatened the caregiver.  Mother said of the caregiver, "that lady is trying to take my baby."  DCFS sought more time to complete a home study on the PGM.  The caregivers continued to seek adoption.  The court (Judge Jacqueline Lewis) stated that "the chances of me placing [H.] with the paternal grandmother are very slim because, if the parents are unable to control themselves, then the Court is not going to be able to even think about placement with relatives."

In December 2013, Father was arrested for carjacking and grand theft, following a police pursuit.  According to police reports, Father approached the victim, who was standing by his car, said, "What's up buddy," punched the victim in the head, causing him to fall to the ground, and stole his car.  When Father finally gave up, he left the vehicle yelling, "I'm god, who are you, what authority do you have!"  He was incarcerated.  DCFS continued to ask the court to move H. to the home of the PGM.

A newly appointed judge (Connie Quinones) was assigned to the case, and placed H. with the PGM in February 2014.  In June 2014, DCFS reported that H. received counseling to address emotional reactivity and temper tantrums.  She had four placements

since being removed from parental care. Mother visited H. twice per month at the DCFS office. The visits went well. Father was incarcerated, but calls H. weekly. DCFS continued to identify adoption as the permanent plan for the three-year-old. From February through August 2014, Mother missed most of her visits and did not call, leaving H. to sit and wait, unavailingly, in the DCFS lobby. The child was negatively affected, and cried as she speculated that "Maybe my mom's in jail." DCFS asked the court to reduce Mother's visits to once per month.

In September 2014, the court found that the conditions justifying jurisdiction still exist, and identified the appropriate permanent plan as adoption, which was likely to be achieved by March 2015. The court found that DCFS provided reasonable services.

Mother filed a new petition for modification in September 2014. She again stated that she "completed Phase 1" of a domestic violence program. Indeed, her petition was virtually identical to the one she filed exactly one year earlier, seeking to reinstate reunification services. The court scheduled a hearing on the petition.

In response, DCFS observed that Mother did not complete the second phase of her domestic violence program, completing 16 out of 32 classes. Mother has not attended sessions since August 2013, and was discharged from the program because she violated the rules by arriving at sessions with a male companion. Mother's behavior shows that she did not benefit from her programs: during a visit in August 2013, Mother yelled at a monitor in the DCFS office and used profanities; she called the caregivers' home and cursed at them; and in September 2014, Mother became belligerent at the DCFS office, yelling and cursing in the lobby. Mother attended only 10 anger management sessions and seven individual counseling sessions. DCFS asked the court to deny Mother's petition, because she has did not complete the case plan in over two years.

At the hearing on October 15, 2014, Mother testified that she completed parenting classes, 10 individual counseling sessions, and Phase 1 of a domestic violence course. She admitted that she did not do Phase 2 because she was expelled from the program. She thought she only had to do 12 weeks of domestic violence, because her attorney and the social worker said so. She learned that she is the victim of domestic violence and

9

needs to avoid people who harm her. Mother identified the "first incident" of violence as the one occurring in July 2012, and a second incident occurred in 2013, when Father punched her while she was driving.

Mother now has a restraining order against Father, who is incarcerated for the carjacking. Mother did not obtain a restraining order after the "first" incident because "I really didn't want to keep him from his daughter" and she always forgave him and gave him another chance. She visits H. twice per month, with a monitor at the DCFS office. She has missed multiple visits in the last six months. Mother recently enrolled in—but had not started—a domestic violence course.

Both DCFS and H.'s attorney argued that Mother did not meet either prong for granting a petition for a modification: there are no changed circumstances and modification is not in the best interests of the minor. The court found that Mother "is a young lady who has been in this court since 2012. She had a little baby that was taken from her." Mother misunderstood the domestic violence requirements: though the case plan indicated 52 weeks, Mother completed Phase 1 (16 weeks), plus she has a restraining order against Father. These are changed circumstances. Mother has a tender bond with H. so the court decided to give Mother "the benefit of the doubt" and grant further reunification. Mother is required to complete Phase 2 of a domestic violence course, and a Phase 3, if there is one. In addition, she must participate in individual counseling. The court wanted Mother to have more visits.

The court found that continued jurisdiction is necessary, and that return of H. to parental custody would create a substantial risk of detriment to the safety, well-being and protection of the minor. Continued placement with the PGM is appropriate. Mother has made "satisfactory" progress toward alleviating the causes necessitating removal. The court continued the matter for six months. Minor's counsel objected to Mother visiting H. once a week, because it negatively affects the child. The court authorized Mother to visit once a week, over the objections of DCFS and minor's counsel.

10

DCFS appeals the order granting Mother's petition for a modification and vacating the permanent plan hearing. The order is appealable. (§ 395.) We review the order for an abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) Trial court discretion "'is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.'" (*Sargon Enterprises. Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

"[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) A parent is given a defined period of reunification services, to limit "the length of time a child has to wait for a parent to become adequate." (*Id.* at p. 308.) When a one-year-old child is removed from parental custody, a parent may receive six months of services. (§ 361.5, subd. (a)(3).) The "absolute maximum period for services" is 24 months after removal; even then, the court must find "that it is in the child's best interest to have the time period extended and that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian . . . within the extended time period." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843; § 361.5, subd. (a)(4).) Services are "first presumed, then possible, then disfavored." (*Tonya M.*, at p. 845.)

The court removed H. from Mother's custody on July 20, 2012, and ordered reunification services. Mother's services were terminated on May 28, 2013, because she made "minimal" progress toward addressing the problems that led to this dependency proceeding. One month earlier, Mother was punched in the face when she argued with Father, showing that neither parent benefited from services in a year's time: Father was still violent and Mother was still associating with him. There was no substantial likelihood that H. could be returned to parental custody.

Once reunification services are terminated and a section 366.26 hearing is set, the primary focus is on the child's need for permanency and stability; a parent's interest in the custody and companionship of the child is not paramount. (*In re Marilyn H.*, *supra*, 5

11

Cal.4th at pp. 309-310; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) Children have a fundamental right to a placement that is stable and permanent. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 419.) Termination of services "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236-237.)

A parent may revive the reunification issue only by demonstrating "a substantial change in circumstances regarding the child's welfare" such that modification will promote the child's best interests. (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577; see § 388.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) To make its determination, the court considers the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Mother utterly failed to show any evidence of changed circumstances.

Mother's September 2013 petition (which was summarily denied) and her September 2014 petition are identical. By September 2013, she had taken "Phase 1" of a domestic violence class (then was expelled) and had obtained a restraining order against Father. By September 2014, Mother had taken "Phase 1" of a domestic violence class, and the restraining order was still in place. No change in circumstances occurred. In October 2014, days before the permanent plan hearing, she enrolled in—but had not started—"Phase 2" of a domestic violence program.

Mother had ample time to prove fitness between July 2012 and October 2014. Her desultory efforts in 2012 and 2013—taking a handful of classes and a few counseling sessions—had no measurable effect. In December 2012, Mother called DCFS, crying, because Father threatened to kill her. She was instructed to obtain a restraining order, but did not, rationalizing that Father is just "emotional and crazy." In March 2013, Father punched Mother in the face, and was arrested. Mother once again refused to obtain a restraining order. Mother stopped taking domestic violence classes in August 2013. At

12

the hearing in October 2014, Mother falsely testified that there were only two incidents of domestic violence, one in 2012 and one in 2013. In fact, the court found at the jurisdiction hearing that Father has been physically assaulting Mother since 2008.

Apart from Mother's lack of progress throughout the proceeding, Mother "did not state [s]he was currently able to provide [H.] a stable, safe permanent placement. [S]he sought only to continue the dependency proceedings, which had been initiated [851 days] earlier. 'Childhood does not wait for the parent to become adequate.' (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) This showing of changing circumstances is not sufficient." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Mother was homeless for most of this proceeding. Absent proof that she could presently provide H. with a safe, permanent home, an extension of the proceeding was unwarranted.

Asked how additional reunification services would benefit H., Mother wrote that "she loves her daughter dearly and is committed to providing her with a loving, safe and stable home environment." This does not come close to a showing that a modification would be in the child's best interests. Mother's focus is solely on herself, not on the child's needs.

In determining a child's best interest, the court considers (1) the seriousness of the reason for dependency jurisdiction; (2) the strength of the bonds between the child, the parent and the caretakers; and (3) whether the problems leading to dependency may be easily removed or ameliorated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)

In this instance, the seriousness of the reason for dependency jurisdiction cannot be understated: Mother was at risk of being seriously injured in H.'s presence. Mother has a bond with H. However, she has not progressed to unmonitored visitation, let alone demonstrated an ability to take custody. Termination of parental rights is appropriate when "the parents have . . . [not] advanced beyond supervised visitation" (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51), because a true parental relationship does not require a third party to monitor parent-child visits.

Mother was belligerent and foul-mouthed with the DCFS monitor during visits, and with H.'s caregivers, despite taking anger-management classes. Her visits tailed off

before the October 2014 hearing. She missed many of her twice-monthly visits and failed to notify anyone beforehand. This traumatized H., who had to wait in the DCFS lobby, crying, for a parent who did not show up.[3]

On the day of the permanent placement hearing, H.'s interest in permanency and stability outweighed the remote possibility of future reunification with Mother. Though parent-child reunification is favored at the beginning of the dependency process, the opposite is true at the end of the process, because the Legislature recognizes the child's interest in a stable, permanent home. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 420.) The court should not have reinstituted services.

During the hearing, the court said, "I think this little girl deserves to have her mother in her life and her father in her life." The court is wrong. Its statement demonstrates not even a passing familiarity with the petition or the record. The fact is, Father is a dangerous felon who regularly beats up women, then denies it. Mother was beaten by Father for four years, yet continued her relationship with him even after H. was born. In 2012, Father pushed Mother into a wall, threw her to the ground, choked her and prevented her from breathing, and burned her neck with a cigarette, in the child's presence. Those are the sustained charges in this case. Mother lied and denied that Father attacked her, saying she "hit herself with a door" and burned herself with Father's cigarette, recanting because "[my] baby needs her daddy." As Mother continued to associate with Father while receiving reunification services, he threatened to kill her, then punched her in the face. No rehabilitation occurred.[4]

---

[3]    It is troubling that the court ignored the protestations of *minor's counsel* that Mother's visits negatively affect the child. Minor's counsel represents the child's desires and interests, and should not be pushed aside.

[4]    We take judicial notice that the court, on April 22, 2015, offered Mother *new* services, and is now having Mother "test on demand/randomly" for substance abuse, further proof that this case is seriously off course. The proceeding should be over, yet Mother is starting drug rehabilitation, leaving Harmoni to linger in legal limbo. On June 23, 2015, the court set a permanent plan hearing; however, it ordered DCFS "to continue to provide [drug] testing to Mother," raising the likelihood Mother will file

14

DCFS foolishly urged the dependency judge, who was new to the case, to remove H. from her safe and stable placement with the prospective adoptive L. family, and instead place her with the PGM. DCFS knew that the PGM advocates for Father: she is unconcerned about his life-long career as a thug. His five-page rap sheet aside, the PGM thinks Father is wonderful. Even after reading the police report recounting the injuries Father inflicted on Mother in 2012, including a cigarette burn and strangulation, the PGM vehemently denied that Father abused Mother, despite Father's 2007 conviction for brutally stomping on a woman's neck and repeatedly dropping a television on her head.

The court's ill-considered order to move H. to the PGM's home was made not three months after Judge Lewis wisely stated that the likelihood of placing H. with the PGM "are very slim" because the parents (especially Father, given his history of violent felonies) are out of control. When Father is released, he will resume living with the PGM, and H. will be exposed to him without limitation. DCFS and the court have heedlessly endangered H.'s safety. Unfortunately, it is difficult to "unring" this bell, after the child has been emotionally traumatized by multiple needless moves, starting with her removal from the home of her aunt, a probation officer, after Father leveled the absurd accusation that the aunt's seven-year-old son purchased $190 worth of pornography at the PGM's home. Father then threatened the prospective adoptive L. family. We greatly fear for H.'s future safety in the PGM's home.

The order granting Mother's request for reunification services, and vacating the permanent plan hearing to terminate parental rights, was an arbitrary, capricious and patently absurd determination that exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

---

another section 388 petition claiming that she complied with drug testing. Because services are continuing, three years after detention, the appeal is not moot, so Mother's requests for dismissal are DENIED.

## <u>DISPOSITION</u>

The order vacating the permanent plan hearing and granting respondent's petition for a modification is reversed. The case is remanded to conduct a permanent plan hearing under Welfare and Institutions Code section 366.26, without further delay.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

16