Filed 1/6/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B297509 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA097910) |
| v. | |
| LEONARD LEJOHN GONZALEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge. Affirmed in part and reversed in part.

Joy A. Maulitz under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

—————————

A jury convicted Leonard Lejohn Gonzalez of robbing three people to help his gang. The gang enhancements, however, lack substantial support. We strike them and otherwise affirm. Unspecified statutory citations are to the Penal Code.

I

Gonzalez snatched necklaces from three people.

On January 9, 2018, a man in a hooded sweatshirt approached Young Soon Kim and her daughter at her car in a grocery store parking lot. It was dark. The man grabbed a gold necklace around Kim's neck. She grabbed it too. It broke and the man ran away with half, leaving scratches on Kim's neck.

On February 4, 2018, 81-year-old Francisco Candelario and his wife returned to their residence after shopping. With his hood up, a man in a hooded sweatshirt entered Candelario's yard. He grabbed a gold necklace from Candelario's neck. The necklace broke and the man ran off with it. Candelario had paid $5,000 for the necklace.

On February 9, 2018, 72-year-old Douglas Olivera was loading groceries into his car in a parking lot. A man in a sweatshirt pushed Olivera against his car and grabbed the gold necklace from Olivera's neck. An unidentified driver drove the man away in a car, leaving Olivera with "a little bump," "a red spot on [his] neck." Olivera could not remember if a hood covered the man's head. Olivera "might have" seen the man's neck.

An information charged Gonzalez with three counts of second degree robbery (§ 211; counts 1–3). It further alleged counts 1, 2, and 3 were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)) and Gonzalez had two prior serious felony convictions (§§ 667, subds. (a)(1) & (d), 1170.12, subd. (b)).

The court granted the prosecution's motion to dismiss other counts.

The three victims identified Gonzalez as their assailant to the jury. A video showed Gonzalez at one crime scene.

The parties stipulated that the Boulevard Mafia Crips was a criminal street gang within the meaning of section 186.22 and that Gonzalez belonged to this gang.

Long Beach Police Officer Alexander Roberts testified as a gang expert. Roberts targeted gangs in northern Long Beach, including the Boulevard Mafia Crips. His job was combating gangs.

Roberts explained his "three-pronged approach" for determining gang membership. "I'll look at clothing and determine if that's representative of membership to a gang. I will judge, based on the location in which we are at, as whether or not that's gang territory. And then, more specifically, I'll look at tattoos that they may or may not have and what they're representative of."

Roberts said the Boulevard Mafia Crips had 10 to 30 members; its primary activities included shootings, burglaries, robberies, and illegal weapon possession. The Boulevard Mafia Crips's tagline was "only chase dollars." Members sought to "present themselves in an affluent light" by driving nice cars, staying at expensive hotels, and posting pictures of themselves with cash.

Roberts said no gang member could "sit idly by." Rather, "[o]nce you join the gang, it's required that you put in work. By putting in work, what they mean is to commit crimes on behalf of the gang." Gang members commit crimes to "bolster the status of themselves but also the gang." He said gang members typically

share proceeds from their crimes.  Roberts opined that if a gang member were to commit a crime and not share the proceeds, he "would be seen as disrespectful . . . .  [He] can be excommunicated from the gang or harmed or killed."

Roberts knew Gonzalez personally.  Roberts had contacted Gonzalez many times and had helped arrest him.  Roberts explained Gonzalez's gang moniker was "Cash Boy."  Roberts described Gonzalez's three gang-related tattoos.  One of these tattoos covered the front of Gonzalez's neck.

The prosecution asked Roberts a hypothetical question.  The hypothetical described a gang with a culture of committing crimes, including robberies, and of displaying "a wealthy lifestyle."  The hypothetical included three robberies identical to those in this case.  The hypothetical question asked, "based on those facts, do you have an opinion as to whether each crime of robbery was committed for the benefit of or in association with or at the direction of a criminal street gang?"

Roberts answered yes:  he believed the hypothetical gang member committed the crimes to benefit his gang.  He said, "Based upon the hypothetical, he promoted and furthered the gang by committing those crimes . . . he's assisting his gang in having a feared reputation.  He's providing value or monetary value to his gang, as well as bolstering his reputation within the gang, as well as the gang within the community."

On cross-examination, Roberts conceded a gang member can commit a crime for himself and not for the benefit of his gang.  Roberts admitted many gang connections were missing in this case.  He admitted:

- Gonzalez worked alone in two robberies;

- during the robberies, Gonzalez did not wear gang colors;
- during the robberies, Gonzalez did not display gang-related sports insignia;
- during the robberies, Gonzalez did not make gang hand signs;
- during the robberies, Gonzalez spoke no gang slogans or words; and
- the robberies were outside his gang's territory.

Roberts also admitted there was no evidence on many points:

- Nothing suggested that Gonzalez showed the stolen necklaces to other gang members or that other gang members learned about the robberies another way;
- no facts demonstrated Gonzalez's one-time getaway driver was a gang member;
- no proof showed anyone sold the necklaces; and
- there was no evidence Gonzalez told anyone about these robberies.

Although not addressed in the cross-examination, none of the victims saw Gonzalez's tattoos or saw Gonzalez make a gang sign. None said they believed Gonzalez was a gang member.

Roberts said his opinion was not based on any direct evidence, but "on the pattern of my observations about this gang, as well as [of Gonzalez], and how he does display a propensity to commit violence in social media posts, videos, et cetera."

Roberts was asked to describe a scenario where a gang member committed a crime, not for the benefit of his gang, but solely for the member's personal benefit.

Roberts answered by describing an instance where the lone gang member did not "tell anyone else in the gang about that crime itself.  That would be an instance in which a gang member commits a crime for himself only."

Roberts then was asked, "Who, to your knowledge, did Mr. Gonzalez ever tell he committed these robberies?"

Roberts answered, "As I mentioned previously, I have no knowledge of your defendant ever mentioning that he committed a crime."

The jury found Gonzalez guilty of all three counts of robbery and found the gang allegations true.  The court sentenced Gonzalez to 25 years to life in prison on count 1, plus five years for the prior serious felony enhancement.  It sentenced him to 25 years to life on counts 2 and 3, to run concurrent with the principal term.  It also sentenced him to 15 years each for the gang enhancements, to run concurrent with the life sentences, and stayed those under section 654.

II

We strike the gang enhancements because no substantial evidence supported them.

To support a true finding on a section 186.22, subdivision (b) gang enhancement, the prosecution must prove (1) the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, and (2) the defendant intended to promote, further, or assist criminal conduct by gang members.  (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).)

We review the record in the light most favorable to the judgment to determine whether it contains substantial evidence.  (*Albillar*, *supra*, 51 Cal.4th at pp. 59–60.)  We affirm unless no

6

substantial evidence supports the verdict on any hypothesis.  (See *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Expert opinion can support a gang enhancement under section 186.22, subdivision (b)(1).  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

Expert opinion, however, must not be speculative.  Expert opinion has no value if its basis is unsound.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769, 770 (*Sargon*).)  Expert opinion must have a logical basis. Experts declaring unsubstantiated beliefs do not assist the truth-seeking enterprise.  (See *Vang*, *supra*, 52 Cal.4th at p. 1046.) This applies to all experts, including gang experts.  (*Ibid.*; see *People v. Franklin* (2016) 248 Cal.App.4th 938, 949–952 [striking gang enhancement supported only by gang expert's speculation].)

This gang expert had no logical basis for his opinion. Roberts said Gonzalez was "assisting his gang in having a feared reputation."  But this claim made no sense when nothing linked these crimes to a gang.

Roberts said Gonzalez was "providing value or monetary value to his gang . . . ."  But Roberts also conceded no evidence showed Gonzalez shared robbery booty with the gang.

Roberts said Gonzalez had a "propensity to commit violence."  Propensity evidence generally is forbidden.  (See Evid. Code, § 1101, subd. (a).)  Beyond this problem, the inference is illogical.  A propensity for violence is logically unconnected to a decision to act for the benefit of a gang.  One fact does not imply the other.

The expert also based his opinion "on the pattern of my observations about this gang, as well as [of Gonzalez] . . . ."  It is insufficient for an expert simply to announce, "based on my

experience and observation, X is true." This is the method of the Oracle at Delphi. It is the black box. This method cannot be tested or disproved—a feature convenient for would-be experts but unacceptable in court. " 'This "Field of Dreams" "trust me" analysis' " amounts only to a defective " 'faith-based prediction.' " (*Sargon*, *supra*, 55 Cal.4th at p. 766; see *id.* at p. 778 [excluding expert opinion that was " 'nothing more than a tautology' "].)

This expert contradicted himself on the central point. He gave an example of a crime that was not for the benefit of a gang: where the perpetrator did not "tell anyone else in the gang about that crime itself. That would be an instance in which a gang member commits a crime for himself only." That example matches this case. Yet this match did not faze the expert or prompt him to reconcile his contradictory claims.

The prosecution did not present evidence to prove Gonzalez committed these crimes for the benefit of the Boulevard Mafia Crips, as required by the first prong of section 186.22, subdivision (b). We need not reach the second prong.

### III

Gonzalez attacks his robbery convictions on the ground the trial court had an independent duty to instruct on the lesser included offense of theft. Gonzalez claims the evidence was sufficient to justify convictions on this lesser offense.

Whether the trial court erred in failing to give this instruction turns on whether there was some evidentiary basis on which the jury could have found the offense to be less than robbery. (*People v. Garcia* (1996) 45 Cal.App.4th 1242, 1245–1246 (*Garcia*), overruled in part on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 365, fns. 2 & 3.)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The standard jury instruction does not define "force" because its definition in the context of robbery is commonly understood. (Com. to CALCRIM No. 1600 (2020 ed.) p. 1132 [citing *People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709].)

Gonzalez's actions satisfy this standard of a commonly understood level of force. Owners of gold necklaces do not remove them by yanking them off the neck and breaking them. No one does that in an ordinary setting. It ruins the necklace. When another person yanks your necklace from your neck, the act is forceful. This fact is commonly understood.

Gonzalez used enough force to qualify as a robber. In *Garcia*, the "rather polite" Garcia gave a cashier a mere tap on the shoulder. That was enough. (*Garcia*, *supra*, 45 Cal.App.4th at 1244–1246.) Gonzalez's three episodes of yanking and breaking were more forceful than Garcia's polite tap.

Gonzalez was either guilty of robbery or not guilty of any crime. There was no instructional error.

## IV

Gonzalez challenges various fines and fees assessed against him. Gonzalez now says the fines and fees must be stayed or stricken until the court determines he has the ability to pay them. Gonzalez forfeited these claims by failing to object. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154–1155.)

## DISPOSITION

We reverse the true findings on the gang enhancement allegations attached to counts 1, 2, and 3 and strike the terms imposed and stayed for those enhancements. We direct the court

9

to amend the abstract of judgment accordingly and to forward a certified copy to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


                                        WILEY, J.

We concur:


        GRIMES, Acting P. J.


        STRATTON, J.