Filed 6/15/26  Karkera v. Redlands Community Hospital CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| REVATHI KARKERA, as Conservator, etc. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> REDLANDS COMMUNITY HOSPITAL, INC., <br><br> Defendant and Respondent. | D087437 <br><br><br> (Super. Ct. No. CIVSB2215317) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Donald Alvarez, Judge.  Affirmed.

 Burch & Cracchiolo, Susan G. Dana-Kobey, Daryl Manhart, Bryan F. Murphy; Law Offices of Merel Grey Nissenberg and Merel Grey Nissenberg for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Corinne C. Bertsche, Bryan R. Reid, and Dean H. McVay, for Defendant and Respondent.

Revathi Karkera and Anchal Karkera (plaintiffs), as conservators for Dr. Suchal Karkera (Dr. Karkera), appeal from a judgment entered in favor

of Redlands Community Hospital, Inc. (Redlands) after the trial court granted the hospital's motion for summary judgment in their medical malpractice action. Plaintiffs' primary argument on appeal is that the court erred by excluding portions of an expert opinion which they contend demonstrate the existence of a material factual dispute. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Surgery*

In April 2021, Dr. Karkera, a 34-year-old family medicine physician, was admitted to Redlands with nausea, vomiting, headache, and visual deficits from a tumor in her brain. In May 2021, Dr. Michael Schiraldi, a neurosurgeon at Redlands, performed an endoscopic endonasal transsphenoidal resection surgery (ETSP) on Dr. Karkera, with assistance from Dr. Vladamir Cortez, Dr. John Kiessling, Dr. Ajay Ramnot, and Dr. Louis Reier. After the surgery, Dr. Karkera experienced complications requiring emergency placement of external ventricular drains and intubation. Her mental status worsened, and she needed additional interventions and hourly checks in the intensive care unit. Dr. Karkera's family eventually decided to transfer her to another hospital in June 2021 for further treatment.

Dr. Karkera now suffers from persisting right hemiparesis and third cranial nerve palsy, which has led to right-side paralysis and blindness in her left eye, rendering her permanently disabled.

B. *The Complaint*

In July 2022, plaintiffs filed suit as Dr. Karkera's co-conservators against Dr. Schiraldi, his medical group, Redlands, corporate entities associated with the hospital, and other physicians who provided Dr. Karkera

2

with healthcare services in connection with the surgery. The complaint alleges professional negligence, breach of fiduciary duty, and battery against Dr. Schiraldi and other neurosurgeons involved in the surgery (cause of action one, two, and five); professional negligence against the anesthesia providers (cause of action three); lack of informed consent and battery against the neurosurgeons (causes of action four and five); and "statutory"[1] and professional negligence against Redlands (causes of action six and seven).

The sixth cause of action alleged, among other things, that Redlands failed to comply with California Code of Regulations (CCR) title 22, section 70701, subdivision (a)(7) (section 70701(a)(7)) requiring that a hospital's governing body "establish controls that are designed to ensure the achievement and maintenance of high standards of professional ethical practices including provision that all members of the medical staff be required to demonstrate their ability to perform surgical and/or other procedures competently and to the satisfaction of an appropriate committee

---

[1] Plaintiffs have based their "statutory negligence" claim on Evidence Code section 669, which provides that a rebuttable presumption of negligence may arise in certain circumstances, including when a person violates "a statute, ordinance, or regulation of a public entity." (Evid. Code, § 669, subd. (a)(1).) This is properly referred to as "negligence per se" rather than "statutory negligence" and is merely an evidentiary rule, not the basis for a separate cause of action. (See *McKenna v. Beesley* (2021) 67 Cal.App.5th 552, 574, fn. 26 [doctrine of negligence per se is not a separate cause of action, but creates an evidentiary presumption that affects the standard of care in a cause of action for negligence].)

or committees of the staff, at the time of original application for appointment to the staff and at least every two years thereafter."[2]

The seventh cause of action alleged, in relevant part, that Redlands breached its duty of care, including in investigating its neurosurgeons' competency, evaluating the quality and adequacy of the medical care they rendered to patients, establishing credentialing procedures and standards to ensure their continued competence, and having "appropriate contingency planning" to avoid subjecting patients to unreasonable risk of harm and inadequate medical care.

*C. Redlands' Summary Judgment Motion*

In July 2024, Redlands moved for summary judgment or summary adjudication of issues on the only causes of action asserted against it in the complaint: the sixth and seventh causes of action.

In their respective statements of undisputed facts, the parties admitted that the following facts about Redlands' credentialing process were undisputed. Redlands grants staff privileges to physicians if their application for privileges is approved, and Redlands will only approve an application if a physician meets certain qualifications established to ensure competency. The medical staff services office at Redlands reviews applications and verifies each physician's initial qualifications and other evidence submitted in support of the application. The relevant department

_____

[2] Plaintiffs also alleged in their complaint that Redlands violated CCR title 22, section 70703, subdivisions (f) and (h), and section 70433, subdivision (a)(2). Plaintiffs do not argue on appeal that the trial court erred in ruling that they had failed to raise a triable issue of material fact as to whether Redlands violated those statutes to support their negligence per se claim. Accordingly, we limit our review to section 70701(a)(7).

4

chair then reviews each file, and if they approve the application, the credentials chair or committee reviews the supporting information and documentation. The credentials chair or committee then makes a recommendation to the medical executive committee, which reviews the recommendation and decides what to recommend to the hospital's board of directors. The board ultimately decides whether to appoint the physician to Redlands' medical staff and grant the physician staff privileges.

When Redlands grants privileges to a surgeon, the surgeon must have their initial four procedures at the hospital proctored to ensure they are providing quality treatment. A physician's appointment to hospital staff, and its accompanying privileges, are only valid for two years, after which each applicant must request reappointment.

Redlands followed this review procedure in granting Dr. Karkera staff privileges as a neurosurgeon. Once credentialed, Redlands does not control or supervise the manner in which physicians with staff privileges provide services to patients, and Redlands does not exercise control over the physicians' clinical judgment or medical decisions.

The parties disagree about whether Redlands' credentialing process was sufficient to ensure the competency of its neurosurgeons. In support of its motion, Redlands submitted a declaration from Christina Andrews, the manager of medical staff services at Redlands, and an expert declaration from Dr. Howard Tung, a neurosurgeon. Andrews stated in her declaration that Redlands' credentialing procedures comply with the applicable standard of care and all statutory requirements because the process requires that new applicants "must have performed within the last 12 months at least fifty (50) neurological surgical procedures reflective of the scope of privileges requested, or successful completion within the past 12 months of an

5

Accreditation Council for Graduate Medical Education [ACGME] or American Osteopathic Association accredited residency or clinical fellowship."

In addition to opining on whether hospital staff adhered to the applicable standard of care in treating Dr. Karkera, Dr. Tung also opined that because ETSP surgery "is a procedure that is within the core skills of any neurosurgeon that has successfully completed their residency from an accredited program," and because residents will have had to perform the procedure numerous times before graduating from residency, "Dr. Schiraldi, as a credentialed neurosurgeon having completed his residency, was fully and appropriately qualified to perform such a procedure[.]"  Relying on these affidavits, Redlands argued that there was no need for Dr. Schiraldi to make an additional showing of specific competence to perform ETSP surgery, beyond what is required for credentialing, for the hospital to fulfill its duty of care.

Plaintiffs submitted declarations from four experts in opposition to Redlands' motion: (1) Dr. Andrew Little, a neurosurgeon; (2) Dr. Gary Reese, a neurologist; (3) Dr. Harold Pretorius, an endocrinologist; and (4) Dr. Stephanie Jackson, a hospital administrator with experience in hospital credentialing.  Plaintiffs acknowledged that Dr. Schiraldi had assisted in 29 ETSP surgeries during his neurosurgical residency, and that the minimum required for certification by the American Board of Neurological Surgery is 20.  Relying primarily on Dr. Jackson's opinion, plaintiffs argued that just because neurosurgery residents are required to assist in a minimum of 20 ETSP procedures before graduating does not mean they are competent to perform the procedure as the chief neurosurgeon upon completing residency.  Plaintiffs contended that Dr. Schiraldi, who had not assisted with an ETSP surgery since March 2018 during his residency, was

6

not competent to perform the surgery as chief neurosurgeon more than three years later in May 2021. According to plaintiffs, the fact that Redlands granted core privileges to all its neurosurgeons which allowed them to perform ETSP surgeries without any "specific demonstration of their competence" to do so, and without monitoring, constituted a violation of the hospital's duty to ensure its credentialed physicians are competent to perform the surgical procedures for which they are granted privileges.

Plaintiffs also argued, relying on Dr. Pretorius's opinion, that Redlands was negligent in allowing Dr. Karkera's ETSP surgery to proceed without a preoperative evaluation by an endocrinologist. Dr. Pretorious opined that such an evaluation would have revealed comorbidities and anomalies "which mandated transfer to a hospital facility with a higher level of care."

*D. Redlands' Evidentiary Objections*

Redlands objected to portions of Dr. Jackson's declaration in which she opined that the hospital "failed to perform their fiduciary duty to adequately supervise the medical staff credentialing process respecting performance of ETSP surgeries" because Redlands did not require "any demonstration of specific training or experience necessary" beyond what it required in granting core privileges. Redlands also objected to Dr. Jackson's opinion that Redlands did not meet the standard of care "of a reasonably careful hospital facility in granting Drs. Schiraldi and Cortez privileges to perform ETSP surgery" because:

> "[d]espite the complexity of the ETSP surgery and the risks that surgical errors create for the patients there was no specific demonstration of competency required before Dr. Schiraldi was granted privileges to perform ETSP surgery, which was treated as part of the neurosurgery staff's core privileges. There was no monitoring requirement specific to that procedure

7

although Dr. Schiraldi had never been the chief surgeon in an ETSP surgery. There was no apparent process for reevaluation of Dr. Schiraldi's competence at this procedure although he had last assisted in an ETSP surgery in 2018, or any reevaluation of Dr. Cortez's ongoing competence. Further investigation was also necessary due to the fact that, since finishing his residency at Cedars Sinai Medical Center in 2019, Dr. Schiraldi had settled two prior medical malpractice claims."

Redlands further objected to Dr. Jackson's opinion stating that the hospital "caused or contributed" to Dr. Karkera's injuries because "Dr. Little's declaration confirms the important role of a neurosurgeon's experience in preventing complications from ETSP surgery," and Redlands' "credentialing of Drs. Schiraldi and Cortez despite their inexperience enabled them to conduct a surgical procedure which more appropriately should have been entrusted to a more experienced practitioner at another hospital facility with more experience at treating pituitary lesions."

Plaintiffs made no objections to Redlands' evidence in support of its motion.

### E. Trial Court's Ruling

After considering the parties' briefs, supporting documents, and oral arguments at the motion hearing, the trial court issued a written order granting summary judgment to Redlands. The court began by overruling all of Redlands' objections to plaintiffs' evidence, except for the objections to Dr. Jackson's declaration described above. The court sustained those objections on "insufficient foundation" grounds.

The court then found that plaintiffs had failed to demonstrate triable issues of material fact exist for the sixth cause of action regarding whether Redlands breached its duty under section 70701(a)(7). The court explained

8

that plaintiffs' admissible evidence did not establish a dispute over the fact that ETSP surgery is treated as a "core procedure" by the ACGME, and that even if liberally construed, Dr. Jackson's affidavit "provides insufficient foundation to support the conclusion that to meet competency requirements, all core procedures must be performed as part of [Redlands'] proctor requirement before granting staff privileges." The court further found that plaintiffs did not present any expert testimony demonstrating that "it does not meet the hospital community standard of care to include the ETSP procedure as part of a core neurosurgery function or to approve it as a core procedure without requiring proctoring of that specific procedure." Although plaintiffs relied on Dr. Little's testimony, the court determined that Dr. Little's opinion was insufficient to create a triable issue of material fact as to whether Redlands met community standards because the purpose of his opinion was to address whether Drs. Schiraldi and Cortez provided treatment meeting the standard of care applicable to neurosurgeons operating in similar circumstances. The court noted that Dr. Little did "not provide any discussion that other hospitals require special credentialing with respect to privileges that include the ETSP procedure in relation to the hospital community standard of care."

As for the seventh cause of action for professional negligence, the court first found that plaintiffs had demonstrated the existence of triable issues of fact regarding whether Dr. Schiraldi breached his duty of care. But the court went on to find that for the reasons it described regarding the sixth cause of action, plaintiffs had not submitted admissible evidence addressing the hospital's standard of care when it comes to credentialing and granting privileges to neurosurgeons to perform ETSP surgeries. And although plaintiffs had relied on Dr. Pretorius's opinion that the proper standard of

9

care required that Dr. Karkera see an endocrinologist before undergoing ETSP surgery, the court found that Dr. Pretorious's opinion did not create a triable issue of fact as to whether Redlands breached its duty of care by not having an endocrinologist on staff. Whether Dr. Schiraldi should have referred Dr. Karkera to an endocrinologist, the court reasoned, "is a different issue."

After the court granted Redlands' summary judgment motion, it entered judgment in Redlands' favor and dismissed the hospital from the case with prejudice. Plaintiffs moved for a new trial, which the court denied.

DISCUSSION

I

Plaintiffs argue that the trial court abused its discretion when it sustained Redlands' objections to Dr. Jackson's expert opinions, and that the trial court should have found her opinions sufficient to create a triable issue of fact against Redlands.[3] Because we discern no error in the court's decision to sustain Redlands' objections, we conclude that ruling is not grounds for reversal.

*A. Governing Law*

We review the trial court's evidentiary rulings regarding Dr. Jackson's expert opinion for abuse of discretion. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review

---

[3]     Because plaintiffs offer no separate argument addressing why the denial of their motion for new trial was improper, we do not address it here.

10

de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion."].)[4]

A motion for summary judgment "must be decided upon admissible evidence in the form of affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice shall or may be taken. Personal knowledge and competency must be shown in the supporting and opposing affidavits and declarations. The affidavits must cite evidentiary facts, not legal conclusions or 'ultimate' facts." (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 638–639 [cleaned up].) "A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. Even so, the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 [cleaned up].)

In determining the admissibility of expert testimony, "a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data

---

[4] At oral argument, Karkera argued for the first time that we should review the trial court's evidentiary rulings de novo because they deprived her of essential evidence on her claims against Redlands. In her opening brief, however, Karkera conceded that these evidentiary rulings were subject to review for abuse of discretion. Moreover, the case law her counsel referred to at oral argument applies to dispositive in limine rulings on expert testimony, not evidentiary rulings on summary judgment. (See *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962, fn. 7.)

11

and the opinion proffered.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771 (*Sargon*).) "An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based. Thus, in order to defeat summary adjudication, plaintiffs cannot rely on assertions that are conclusionary, argumentative or based on conjecture and speculation, but rather are required to make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact." (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 530 [cleaned up].)

### B. Analysis

Plaintiffs contend that Dr. Jackson's conclusions have "more than adequate foundation" and are "based on evidence the trial court held admissible[,] including declarations from other experts." But as the court observed, Dr. Jackson's declaration did not provide a reasoned explanation, with reference to any established guidelines or standards or her own personal experience, for *why* she concluded Redlands' credentialing failed to meet the applicable standard of care for hospitals. In other words, Dr. Jackson's declaration did not explain why Redlands fell short in its reliance on the standard set by the ACGME, which includes ETSP surgery as a core neurosurgery skill that a physician has obtained by the time they graduate from residency. Instead, Dr. Jackson's declaration made the conclusory assertion that the hospital should have required that its neurosurgeons do more to demonstrate competence in ETSP surgery, without identifying what—in her own personal experience with credentialing—led her to

12

conclude that this is the standard of care ordinarily exercised by hospitals under similar circumstances. (See *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 ["Medical providers must exercise that degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances"].)

Dr. Jackson did not, for example, state that other hospitals where she had worked required additional showings of competence for ETSP surgery, or that some hospitals used guidelines other than ACGME that are more exacting. Dr. Jackson explained that she had served on numerous hospital credentialing committees, she was a member of the quality committee of the board at two hospitals, and she had served as the medical executive support for the board's quality committee at two major health systems. Yet she did not declare that any of these hospitals or health systems (1) required additional showings of competence for ETSP surgery beyond the minimum required for board certification, or (2) treated ETSP surgery as being beyond the core skills of any neurosurgeon who has successfully completed their residency from an accredited program, or (3) required any monitoring or reevaluation specific to the ETSP surgery. In these circumstances, the trial court did not abuse its discretion by excluding Dr. Jackson's standard of care opinions for lack of foundation. On summary judgment, "evidentiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226.)

Plaintiffs' reliance on the fact that Dr. Jackson referenced other admissible expert opinions is also misplaced. The mere fact that other experts' opinions were admissible does not mean they formed a sufficient

13

basis for conclusions regarding the credentialing standard of care for hospitals. For example, Dr. Jackson relied on Dr. Little's statements that ETSP is a "complex surgical procedure" requiring that neurosurgeons be well-trained to reduce the risk of complications, and that completing residency does not necessarily indicate "all" neurosurgeons' competency to "independently perform ETSP." As an initial matter, Dr. Little did not define "independently," and it is unclear whether that term would apply to Dr. Schiraldi's performance of Dr. Karkera's surgery given that Dr. Cortez and other physicians assisted him. More importantly, Dr. Little's personal opinions on ETSP training did not shed any light on the standard of care hospitals commonly follow for credentialing. Dr. Little was not even retained to opine on credentialing. According to Dr. Little, the purpose of his expert opinion was to address whether Drs. Schiraldi and Cortez "complied with the standard of care expected of reasonably careful neurosurgeons under similar circumstances." There is no indication Dr. Little was qualified to opine on credentialing, nor did he address what other hospitals require when it comes to ensuring neurosurgeons are competent to perform ETSP surgery. Moreover, even when taking Dr. Little's statements into account, Dr. Jackson's declaration still did not adequately provide a reasoned explanation for why Redlands' credentialing process failed to meet that standard—even if ETSP surgery is complex and Drs. Schiraldi and Cortez would have benefited from additional practice, as Dr. Little opined.

In these circumstances, we cannot conclude that the trial court abused its discretion by concluding that Dr. Jackson's statements had insufficient foundation to be admissible. The trial court reasonably concluded that there was " 'too great an analytical gap' " between Dr. Jackson's standard of care opinions and the supporting foundational material she cited in reaching those

14

opinions. (*Sargon, supra*, 55 Cal.4th at p. 771.) Accordingly, we affirm the court's decision to sustain Redlands' objections.

This requires us to affirm summary judgment on the negligent credentialing theory. Plaintiffs do not dispute that Redlands met its initial summary judgment burden on the negligent credentialing theory, nor do they contend that they established a triable issue of material fact on this theory without the inadmissible portions of Dr. Jackson's declaration. A breach of the standard of care is an essential element of a malpractice claim and can only be established with expert testimony, unless the circumstances are such that the required conduct is within the layperson's common knowledge. (*San Antonio Regional Hospital v. Superior Court* (2024) 102 Cal.App.5th 346, 350; see also *McAlpine v. Norman* (2020) 51 Cal.App.5th 933, 938 ["Because this is a matter peculiarly within the knowledge of experts, expert opinion testimony normally is required to prove or disprove that the defendant breached the standard of care"].) Without Dr. Jackson's excluded expert opinions on the standard of care for credentialing—which is not something within a layperson's common knowledge—plaintiffs' opposing evidence was legally insufficient to create a triable issue of fact on this theory. Thus, the court properly found no triable issues of material fact on the negligent credentialing theory. To the extent plaintiffs argue that Dr. Jackson's excluded opinions would have created triable issues of material fact if they had been admitted, we need not and do not address those arguments.

## II

We turn next to plaintiffs' argument that they demonstrated the existence of a triable issue of material fact as to the seventh cause of action for professional negligence because they presented evidence that Redlands allowed its neurosurgeons to perform ETSP surgeries "although it did not

15

have the necessary health care infrastructure to support such surgery."
Plaintiffs cite Dr. Pretorious's testimony as an endocrinologist that given
Dr. Karkera's comorbidities, the standard of care required referring
Dr. Karkera to a qualified endocrinologist for preoperative evaluation.
But again, Dr. Pretorious's opinion addressed the standard of care applicable
to physicians, not Redlands.  To the extent Dr. Pretorious made conclusory
statements about what hospitals should or "must" do in terms of maintaining
trained staff, there was no evidence he is qualified to provide testimony on
the standard of care applicable to hospitals when credentialing its physicians
or making staffing decisions.  As with Dr. Little, moreover, his own personal
opinions did not supply evidence of the standard of care hospitals commonly
follow in staffing or credentialing.  For these reasons, we are not persuaded
that plaintiffs' evidence was sufficient to create a triable issue of material
fact as to Redlands' alleged breach of the standard of care for hospitals.

### DISPOSITION

The judgment is affirmed.  Respondent may recover its costs on appeal.


BUCHANAN, Acting P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.

16